IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARROWOOD INDEMNITY COMPANY, FORMERLY KNOWN AS ROYAL INDEMNITY COMPANY AND AS SUCCESSOR TO ROYAL INSURANCE COMPANY OF AMERICA,<br><br>     Plaintiff,<br><br>  v.<br><br>THE ROMAN CATHOLIC DIOCESE OF BROOKLYN, NEW YORK, ROMANO FERRARO, ST. JOSEPH PATRON OF THE UNIVERSAL CHURCH, ST. MICHAEL'S CHURCH, AMERICAN MARTYRS PARISH, CATHEDRAL PREPARATORY SCHOOL, OUR LADY OF THE CENACLE, ST. GABRIEL AT MARY OF THE MOTHER, OUR LADY OF THE PEACE CHURCH, ST. THOMAS AQUINAS, HOLY FAMILY, ST. ROSE OF LIMA R.C.C., ST. FRANCIS OF ASSISI, NAZARETH HIGH SCHOOL, ST. ROSALIA – BASILICA OF REGINA PACIS, ST. LUCY'S PARISH, ST. FRANCIS XAVIER, ST. ALOYSIUS, ST. PETER-ST. PAUL OUR LADY OF PILAR, ST. PATRICK'S R.C.C., OUR LADY OF FATIMA, ST. JOSEPH THE WORKER, OUR LADY OF THE SOLACE SHRINE PARISH, OUR LADY OF GUADALUPE, HOLY TRINITY PARISH, ST. LUKE AND ST. MATTHEW CHURCH, ST. MARGARET OF SCOTLAND CHURCH, IMMACULATE CONCEPTION OF THE BLESSED VIRGIN MARY, OUR LADY OF THE MIRACULOUS MEDAL, ST. JOHN'S HOME FOR BOYS, ST. BARTHOLOMEW SCHOOL, ST. BONIFACE R.C.C.,<br><br>     Defendants. | Case No._____<br><br><br>**COMPLAINT FOR<br>DECLARATORY JUDGMENT** |

    Plaintiff, Arrowood Indemnity Company, formerly known as Royal Indemnity Company

and as successor to Royal Insurance Company of America ("Arrowood"), by way of Complaint

for Declaratory Judgment against Defendants, the Roman Catholic Diocese of Brooklyn, New York ("Diocese"), and Affiliated Entities set forth below, alleges as follows:

**<u>INTRODUCTION</u>**

In this action, plaintiff Arrowood Indemnity Company ("Arrowood") asks the Court to declare that defendant, the Roman Catholic Diocese of Brooklyn ("the Diocese"), and its affiliated parishes and schools, have no insurance coverage for the nearly 500 suits filed against them alleging sexual abuse of minors under the New York Child Victims Act (L 2019, ch 11) (the "CVA").

In these suits, the victims allege that for decades the Diocese permitted, denied and concealed the abuse alleged. It is also alleged that this abuse was the expected result of a culture that reached the highest levels of the Catholic Church, including the Vatican, that allowed the alleged abuse to thrive.

The victims also allege that the Diocese shuffled abusers from parish to parish and diocese to diocese to keep secret the scandal. This alleged pattern is consistent with a nationwide pattern that has emerged in the Catholic Church as a whole and its dioceses and parishes throughout the United States and the world. Grand juries, convened across this country, have published reports detailing the culture of abuse permeating the Catholic Church. In the past two decades alone, New York, New Hampshire, Massachusetts, Pennsylvania, Maine, Missouri and Colorado have all convened grand juries to investigate allegations of sexual abuse in the Catholic Church. Each has published reports detailing similar tactics utilized to keep secret this insidious criminal behavior. These findings paint a pervasive, deep picture of a systemic culture of abuse and concealment.

The Diocese has demanded that Arrowood defend and indemnify it in the CVA suits, despite allegations of the Diocese's long-standing specific knowledge of individual instances of abuse and its decades long culture of coverup.

Arrowood is providing a defense to the Diocese and its parishes and schools in the overwhelming majority of the CVA suits filed against them, subject to a reservation of rights. Arrowood has, at the same time, asked the Diocese and its parishes and schools for information about the allegations in each suit, including information about the specific abusers alleged in the suits and the general knowledge of alleged abuse within the Diocese. Publicly available information indicates that the Diocese has conducted investigations in order to determine those priests and employees within its ranks who were credibly accused of abuse. Furthermore, according to publicly available information, the Diocese is under investigation by the Attorney General of the State of New York regarding its alleged knowledge of sexual abuse occurring in its midst for decades. Upon information and belief, the Diocese has provided extensive information to the Attorney General in response to a Subpoena. It is against this backdrop of its own investigation of abuse within its ranks and the Attorney General's investigation of the Diocese's handling of that alleged abuse that the Diocese essentially refuses to provide Arrowood with any meaningful information in response to the hundreds of individual information requests made by Arrowood in the suits that it is defending. The Diocese provides nothing more than cursory responses and a handful of files that contain decades worth of missing pages, gaps in information, and unexplained and inappropriate redactions, addressing no more than a fraction of the requests that have thus far been made by Arrowood. As it has been alleged for decades with respect to the alleged scandal itself, the Diocese and its affiliated entities now attempt to conceal from its

defending insurer the information to which they are entitled under the terms of their insurance contracts.

Arrowood seeks a declaration that the Diocese and its parishes and schools have no insurance coverage for the CVA suits alleging sexual abuse of minors by known pedophiles and the concealment and coverup of that abuse by the Diocese.

## NATURE OF THE ACTION

1.     This is a declaratory judgment action pursuant to 28 U.S.C. § 2201 in which Arrowood seeks, among other relief, an adjudication of its rights and obligations, if any, under certain insurance policies it issued to the Diocese in connection with certain underlying lawsuits and claims that were filed against the Diocese, and affiliated entities including individual schools, churches, parishes, and other entities under the sponsorship of, or affiliated with, the Diocese (collectively referred to herein as "Affiliated Entities").

2.     Arrowood issued to the Diocese a series of primary policies (hereinafter referred to as the "Arrowood Primary Policies"), and a series of excess polices (hereinafter referred to as the "Arrowood Excess Policies") (collectively, all policies issued to the Diocese by Arrowood will be referred to herein as "the Arrowood Policies").

3.     Plaintiffs/claimants in these suits and/or claims, allege they were injured when they were sexually abused by priests and other individuals for whom the Diocese was allegedly responsible. The suits and claims were brought pursuant to the New York Child Victims Act (L 2019, ch 11) (the "CVA"), which allows a victim of childhood sexual abuse in the State of New York, whose claim was barred by the statute of limitations, to now bring forth a timely claim. The CVA "look back window" first opened on August 14, 2019 and was initially scheduled to close

on August 14, 2020. On May 27, 2020, both houses of the New York State Legislature approved bills extending the expiration of the look back window for an additional year. The extension was signed into law on August 3, 2020 by Governor Andrew Cuomo. The current expiration of the CVA "look back window" is August 14, 2021.

4.      The Diocese has requested that Arrowood provide defense and indemnity coverage to it, and certain Affiliated Entities, in these suits and/or claims (the Underlying Lawsuits will be referred to as "Underlying Lawsuits" and the Underlying Claims will be referred to as "Underlying Claims." Collectively, the Underlying Lawsuits and Underlying Claims brought against the Diocese and the various Affiliated Entities following enactment of the CVA will be referred to herein as the "Underlying Actions").

5.      To date, Arrowood has agreed to participate in the defense of the Diocese and/or Affiliated Entities in numerous Underlying Lawsuits subject to a reservation of rights. In those Actions where Arrowood had insufficient information, it requested production of further information from the Diocese.

6.      Specifically, subject to a reservation of rights, Arrowood has agreed to participate in the defense of the Diocese in all Underlying Lawsuits against the Diocese which allege abuse in the Arrowood Policy Periods, and which do not include allegations of abuse by Father Romano Ferraro ("Ferraro").

7.      In this declaratory judgment action, Arrowood seeks a declaration that it is not obligated to defend and/or indemnify the Diocese and/or Affiliated Entities for Underlying Actions involving previously known abusive priests and/or employees because the abuse that is the subject of these Underlying Actions was known by the Diocese and/or the Affiliated Entities to be certain or substantially certain to occur, and the alleged injury from the abuse was expected or intended,

and was otherwise not fortuitous. For these reasons, neither an "occurrence" nor an accident, as required by the Arrowood Policies has been established.

8.      Arrowood also seeks a declaration that the Diocese has deliberately and materially breached its duty to cooperate in Arrowood's investigation in those Underlying Lawsuits for which Arrowood has agreed to participate in the Diocese's and/or the Affiliated Entities' defense, subject to a reservation of rights, and those Underlying Claims for which insufficient information has been provided. Therefore Arrowood is not obligated to provide a defense to the Diocese for the Underlying Lawsuits, nor is it obligated to indemnify the Diocese in the Underlying Actions, under the Arrowood Policies.

9.      Further, Arrowood seeks a declaration that it is not obligated to provide defense or indemnity for any Affiliated Entities that are not insureds under the Arrowood Policies, during the relevant abuse period alleged in the Underlying Actions.

10.     Finally, Arrowood seeks a declaration that it has no obligation to defend and/or indemnify the Diocese and/or Affiliated Entities under the Arrowood Policies for certain Underlying Actions, to the extent the Diocese and/or Affiliated Entities did not provide Arrowood with timely notice as required under the Arrowood Policies for the claims and/or abuse alleged in those Underlying Actions.[1]

11.     Declaratory judgment is appropriate in this matter because the Diocese, and certain Affiliated Entities, claim they are entitled to a defense and indemnity from Arrowood with respect to the Underlying Actions and Arrowood disputes that it is obligated to provide such defense and/or indemnity pursuant to the Arrowood Policies.

---

[1] Arrowood has included certain coverage defenses in its causes of action in this declaratory judgment complaint; however, the absence of any coverage defense herein shall not be construed as a waiver by Arrowood of any such coverage defense and Arrowood reserves all rights with respect to all available coverage defenses under the policies and at law.

## THE PARTIES

12.     Arrowood is a Delaware corporation with its principal place of business at 3600 Arco Corporate Drive, Charlotte, North Carolina, 28273-8136. Arrowood is licensed to do business and transacts business in the State of New York.

13.     Upon information and belief, the Diocese is a non-profit religious corporation, organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code. The Diocese has a principal place of business located at 310 Prospect Park West, Brooklyn, New York 11215 and is authorized to conduct business under the laws of the State of New York. The Diocese's territory encompasses Brooklyn, New York and Queens, New York.

14.     Upon information and belief, Romano Ferraro is a resident of the State of Massachusetts and an inmate in the custody of the Massachusetts Department of Corrections, known by the Offender ID W83636.

15.     Upon information and belief, St. Joseph Patron of The Universal Church, is an Affiliated Entity church of the Diocese, with a location of 185 Suydam St. Brooklyn, New York, 11221.

16.     Upon information and belief, St. Rosalia-Basilica of Regina Pacis Parish, is an Affiliated Entity of the Diocese, with a location of 1230 65th Street Brooklyn NY 11219.

17.     Upon information and belief, St. Michael's Church is an Affiliated Entity church of the Diocese, with a location of 76 41st Avenue, Flushing, New York, 11355.

18.     Upon information and belief, American Martyrs Roman Catholic Church, is an Affiliated Entity church of the Diocese, with a location of 79-43 Bell Boulevard, Bayside New York 11364.

19.     Upon information and belief, Cathedral Preparatory School and Seminary, is an Affiliated Entity school and seminary of the Diocese, with a location of 56-25 92nd street, Elmhurst, New York 11373.

20.     Upon information and belief, Our Lady of the Cenacle Church is an Affiliated Entity church of the Diocese, with a location of 136-6 87th Avenue, Richmond Hill, New York, 11418.

21.     Upon information and belief, St. Gabriel Mary of the Mother Church is an Affiliated Entity church of the Diocese, with a location of 74 Linwood Street, Brooklyn, New York 11208.

22.     Upon information and belief, Our Lady of Peace Church is an Affiliated Entity church of the Diocese, with a location of 52 Carroll Street, Brooklyn, New York, 11204.

23.     Upon information and belief, St. Thomas Aquinas Church is an Affiliated Entity church of the Diocese, with a location of 1550 Hendrickson Street, Brooklyn, New York, 11234.

24.     Upon information and belief, Holy Family Church is an Affiliated Entity church of the Diocese with a location of 9719 Flatlands Ave, Brooklyn, New York 11236.

25.     Upon information and belief, St. Rose of Lima Roman Catholic Church is an Affiliated Entity church of the Diocese, with a location of 269 Parkville Ave, Brooklyn, New York 11230.

26.     Upon information and belief, St. Francis of Assisi Church is an Affiliated Entity church of the Diocese, with a location of 2117 45th St, Astoria, New York, 11105.

27.     Upon information and belief, Nazareth Regional High School is an Affiliated Entity school of the Diocese, with a location of 475 East 57th street, Brooklyn New York, 11203.

28.     Upon information and belief, St. Lucy's Parish is an Affiliated Entity church of the Diocese, with a location of 802 Kent Ave Brooklyn, NY 11205.

29.     Upon information and belief, St. Francis Xavier Parish is an Affiliated Entity church of the Diocese, with a location of 225 6th Avenue, Brooklyn, NY 11215.

30.     Upon information and belief, St. Aloysius R.C.C. is an Affiliated Entity church of the Diocese, with a location of 382 Onderdonk Ave, Ridgewood, NY 11385.

31.     Upon information and belief, St. Peter-St. Paul Our Lady of Pilar is an Affiliated Entity church of the Diocese, with a location of 234 Congress St, Brooklyn, NY 11201.

32.     Upon information and belief, St. Patrick's R.C.C. is an Affiliated Entity church of the Diocese, with a location of 9511 4th Avenue, Brooklyn, NY 11209.

33.     Upon information and belief, Our Lady of Fatima is an Affiliated Entity church of the Diocese, with a location of 25-02 80th Street, East Elmhurst, Queens, NY, 11370.

34.     Upon information and belief, St. Joseph the Worker is an Affiliated Entity church of the Diocese, with a location of 241 Prospect Park West, Brooklyn, NY 11215.

35.     Upon information and belief, Our Lady of Solace Shrine Parish is an Affiliated Entity church of the Diocese, with a location of 2866 West 17th Street, Brooklyn, NY 11224.

36.     Upon information and belief, Our Lady of Guadalupe Parish is an Affiliated Entity church of the Diocese, with a location of 7201 15th Avenue, Brooklyn, NY 11228.

37.     Upon information and belief, Holy Trinity Parish is an Affiliated Entity church of the Diocese, with a location of 138 Montrose Avenue, Brooklyn, NY 11206.

38.     Upon information and belief, St. Luke and St. Matthew Church is an Affiliated Entity church of the Diocese, with a location of 520 Clinton Avenue, Brooklyn, NY 11238.

39.     Upon information and belief, St. Margaret of Scotland Church is an Affiliated Entity church of the Diocese, with a location of 81 College Rd, Selden, NY 11784.

40.     Upon information and belief, Immaculate Conception of the Blessed Virgin Mary is an Affiliated Entity church of the Diocese, with a location of 2805 Fort Hamilton Pkwy, Brooklyn, NY 11218.

41.     Upon information and belief, Our Lady of the Miraculous Medal is an Affiliated Entity church of the Diocese, with a location of 62-81 60th Pl, Ridgewood, NY 11385.

42.     Upon information and belief, St. John's Home for Boys is an Affiliated Entity of the Diocese, with a location of 150 Beach 110th St, Rockaway Park, NY 11694.

43.     Upon information and belief, St. Bartholomew School is an Affiliated Entity school of the Diocese, with a location of 44-15 Judge St, Queens, NY 11373.

44.     Upon information and belief, St. Boniface R.C.C. is an Affiliated Entity church of the Diocese, with a location of 631 Elmont Rd, Elmont, NY 11003.


## JURISDICTION AND VENUE

45.     This Court has subject matter jurisdiction over this action based on the diversity of the parties pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because this is a civil action between a Delaware corporation with its principal place of business in the State of North Carolina on the one hand, and a New York non-profit religious corporation, and related New York parishes, all based in Brooklyn or Queens, New York, on the other.

46.     This Court has personal jurisdiction over the Diocese because it has its principal place of business in Brooklyn and conducts significant operations and business in this District.

47.     This Court has personal jurisdiction over the Affiliated Entities Defendants because each has a principal place of business in the Eastern District, including Brooklyn and Queens, and conducts significant operations and business in this District.

48.     This Court has personal jurisdiction over Defendant Romano Ferraro because of his contacts with the subject forum and because the events at issue in this case occurred in the subject forum.

49.     Venue in this Court is appropriate pursuant to 28 U.S.C. §§ 1391(a), (b) and (c).

50.     This Court has authority pursuant to 28 U.S.C. § 2201 to grant the declaratory and other relief requested by Arrowood.

## THE UNDERLYING ACTIONS FOR WHICH THE DIOCESE HAS REQUESTED ARROWOOD PROVIDE DEFENSE AND INDEMNITY

51.     The New York Child Victims Act ("CVA") was signed into law by Governor Cuomo on February 14, 2019[2].

52.     The CVA provides a lookback window where child victims of sexual abuse, whose claims were otherwise barred by the statute of limitations, may bring a civil action against responsible individuals or entities.

53.     Since the lookback window opened on August 14, 2019, the Diocese and/or certain Affiliated Entities have been named as defendants in over 500 total lawsuits in New York relating

---

[2] As noted above, on May 27, 2020, both houses of the New York State Legislature approved bills extending the expiration of the look back window for an additional year. The extension was signed into law on August 3, 2020 by Governor Andrew Cuomo. The current expiration of the CVA "look back window" is August 14, 2021.

to sexual abuse of children by Diocesan clergy and/or other individuals over whom the Diocese exercised control.

54.     Numerous other dioceses in New York have been named in hundreds of lawsuits stemming from sexual abuse of minors by priests.

55.     Between August 14, 2019 and the present, the Diocese has requested that Arrowood provide defense and/or indemnity coverage for certain Underlying Actions asserted by Plaintiffs/Claimants against the Diocese and certain Affiliated Entities, alleging sexual abuse by numerous Diocesan clergy and/or other individuals over whom the Diocese exercised control.

56.     Subject to a reservation of rights, Arrowood is defending the Diocese in all suits which allege abuse in the Arrowood Policy Periods, and which do not include allegations of abuse by Ferraro.

57.     Arrowood has issued Requests for Information ("RFI") to the Diocese in all Underlying Lawsuits in which it has agreed to participate in the defense, and Underlying Claims for which the Diocese has provided insufficient information. The RFIs seek information related to the Underlying Actions and have been issued as part of Arrowood's investigation of the Underlying Actions.

58.     Arrowood has advised the Diocese that Arrowood does not have sufficient information to fully evaluate the Underlying Actions, and therefore seeks information in the RFIs to investigate the Underlying Actions.

59.     The Diocese has refused to provide substantive response to hundreds of RFIs, many of which are more than a year old.

60.     The information the Diocese has provided to Arrowood thus far is limited to a fraction of the information requested by Arrowood and is inappropriately redacted, contains large

chronological gaps, and is missing numerous pages without explanation. Despite hundreds of perpetrators having been included in the Diocese's List of Credibly Accused Priests, and despite many of those same perpetrators being the subject of the CVA cases that Arrowood is defending, only a fraction of the information requested has been produced to Arrowood.

61.     Further, as reported publicly, the Diocese has been served with a Subpoena by the New York Attorney General's office in connection with that office's ongoing investigation into clergy abuse in New York State. It has been further reported that the Diocese has been cooperating with this investigation. Arrowood's repeated requests of the Diocese to provide all information it has provided to the New York Attorney General have gone unanswered.

62.     Further, the Diocese has stated publicly that as part of its efforts to create a list of "Diocesan Clergy for whom the Diocese Received Allegations of Sexual Misconduct", an investigation was undertaken into each and every allegation of abuse made against each respective priest to determine the veracity of the allegations. Notwithstanding the admitted investigation conducted by the Diocese required to create this list, none of this information – information that has already been gathered by the Diocese – has been provided to Arrowood. Rather, a select slice of files has been provided to Arrowood, representing a fraction of the total number of abusers relevant to the CVA matters in total, with information gaps that remain unexplained by the Diocese, despite numerous requests for clarification made by Arrowood. None of this information has been identified by the Diocese as the information gathered in its internal investigations for the development of the aforementioned list.


**THE ARROWOOD PRIMARY POLICIES**

63.     Arrowood issued a series of commercial general liability primary policies to the Diocese.

64.     Neither the Diocese nor Arrowood has located complete copies of the Arrowood Primary Policies.

65.     Arrowood makes no admission as to the completeness of the Arrowood Primary Policies, nor as to the policy terms or conditions contained therein.

66.     Upon information and belief, some or all of the Arrowood Primary Policies contain both per person limits and per occurrence limits.

67.     Upon information and belief, some or all of the Arrowood Primary Policies may have contained the following insuring agreement:

> **I.      COMPREHENSIVE GENERAL LIABILITY INSURANCE**
>
> **COVERAGE A — BODILY INJURY LABILITY**
> **COVERAGE B— PROPERTY DAMAGE LIABILITY**
>
> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:
>
> > **Coverage A. bodily injury or**
> > **Coverage B. property damage**
>
> to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the **insured** seeking damages on account of such **bodily injury** or **property damage,** even if any of the allegations of the suit are groundless, false or fraudulent and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.
>
> *       *       *
>
> **II.      PERSONS INSURED**

Each of the following is an **insured** under this insurance to the extent set forth below.

*       *       *

**(c)**      if the named insured is designated in the declarations as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such;

68.      Information currently available to Arrowood indicates that certain of the Arrowood Primary Policies may have contained one of the following Limits of Liability sections:

### 4. LIMITS OF LIABILITY—Coverage A

The limit of bodily injury liability stated in the declarations as applicable to "each person" is the limit of the company's liability for all damages, including damages for care and loss of services, arising out of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by one person as the result of any one accident; the limit of such liability stated in the declarations as applicable to "each accident" is subject to the above provision respecting each person, the total limit of the company's liability for all damages, including damages for care and loss of services, arising out of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by two or more persons as the result of any one accident.

*       *       *

### III.      LIMITS OF LIABILITY

Regardless of the number of (1) insureds under this policy (2) persons or organizations who sustain bodily injury or property damage, or (3) claims made or suits brought on account of bodily injury or property damage, the company's liability is limited as follows:

Coverage A – The limit of **bodily injury** liability stated in the declarations as applicable to "each person" is the limit of the company's liability for all **damages** because of **bodily injury** sustained by one person as the result of any one occurrence; but subject to the above provision respecting "each person", the total

15

liability of the company for all **damages** because of **bodily injury** sustained by two or more persons as the result of any one **occurrence** shall not exceed the limit of bodily injury liability stated in the declarations as applicable to "each occurrence".

Subject to the above provisions respecting "each person" and "each **occurrence**", the total liability of the company for all **damages** because of (1) all **bodily injury** included within the **completed operations hazard** and (2) all **bodily injury** included within the **products hazard** shall not exceed the limit of **bodily injury** liability stated in the declarations as "aggregate".

Coverage A and B – For the purpose of determining the limit of the company's liability, all **bodily injury** and **property damage** arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one **occurrence**.

69.     Further, information currently available to Arrowood indicates that the Arrowood

Primary Policies may have contained the following "Definitions and Conditions" section:

The **DEFINITIONS** section contains the following definitions:

**"bodily injury"** means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom.

**"insured"** means any person or organization qualifying as an insured in the "Persons Insured" provision of the applicable insurance coverage. The insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the company's liability.

**"named insured"** means the person or organization named in Item 1. of the declarations of this policy.

**"occurrence"** means an accident, including continuous or repeated exposure to conditions, which results in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the **Insured.**

**CONDITIONS**

**4**.     **Insured's Duties in the Event of Occurrence, Claim or Suit**

(a)     In the event of an **occurrence**, written notice containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the **Insured** to the company or any of its authorized agents as soon as practicable.

(b)     If claim is made or suit is brought against the **insured**, the **insured** shall immediately forward to the company every demand notice, summons or other process received by him or his representative.

(c)     The **insured** shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **insured** because of **bodily injury** or **property damage** with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not except at its own cost, voluntarily make any payment. assume any obligation or incur any expense other than for first aid to others at the time of accident.

## THE ARROWOOD EXCESS POLICIES

70.     Arrowood issued several excess liability policies to the Diocese.

71.     Neither the Diocese nor Arrowood has located complete copies of the Arrowood Excess Policies.

72.     Arrowood makes no admission as to the completeness of the Arrowood Excess Policies, nor any admission as to the policy terms or conditions contained therein.

73.     Arrowood excess policy bearing policy number RLX 100036, effective July 10, 1964 to October 1, 1967, contains the following provisions:

### Insuring Agreement

To further indemnify the insured in accordance with the applicable insuring agreements of the Primary Insurance against loss subject to the limits stated in item 6, Section I of the Declarations, as fully and to all intents and purposes as though the Primary Insurance including any renewal thereof, or any endorsement issued to form a part thereof, had been issued for the limits set forth in item 6, Section III of the Declarations. This policy shall apply only to coverages for which an amount is indicated in item 6. Section I, of the Declarations and then only in excess of the corresponding amount as indicated in item 6, Section II of the Declarations.

*       *       *

3.      <u>Notice of Loss</u>

Whenever the Insured has information from which the Insured may reasonably conclude that an occurrence covered hereunder is likely to involve this policy, notice shall be sent to the Company as soon as practicable. Such notice shall contain particulars sufficient to identify the Insured and also reasonably obtainable information respecting the time, place and circumstances of the occurrence.

4.      <u>Assistance and Cooperation</u>

The Company shall not be called upon to assume charge of the settlement or defense of any claims made, or suits brought or proceedings instituted against the Insured but the Company shall have the right and shall be given the opportunity to associate with the Insured or the Insured's underlying insurers, or both, in the defense and control of any claim, suit or proceeding where the claim or suit involves or appears reasonably likely to involve the Company. in which event the Insured and the Company shall cooperate in all things in the defense of such claim, suit or proceeding.

74.     Neither the Diocese nor Arrowood has located complete copies of the Arrowood Excess Policies.

75.     The Arrowood Excess Policies from October 1, 1972 through October 1, 1975, contain the following insuring agreement:

**SECTION I – Insuring Agreements**

**1. Coverage**

To Indemnify the Insured for all sums which the Insured shall become legally obligated to pay as damages because of
      a. Personal Injury
      b. Property Damage
      c. Advertising Liability
caused by an occurrence which takes place during the policy period anywhere in the world.

## 2. Defense, Supplementary Payments

With respect to any occurrence not covered by underlying insurance specified in the Declarations or any other underlying insurance collectible by the Insured, but covered by the terms and conditions of this policy, without regard to the retained limit contained herein, the Company shall

a. have the right and duty to defend any suit against the Insured seeking damages on account thereof, even if such suit is groundless, false or fraudulent, but the Company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;

b. pay premiums on appeal bonds required in any such suit, and premiums on bonds to release attachments in any such suit for an amount not in excess of the applicable limit of liability of this policy, but the Company shall have no obligation to apply for or furnish Any such bonds;

c. pay all expenses incurred by the Company, all costs taxed against the Insured in any such suit and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the Company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the Company's liability thereon;

d. reimburse the Insured for all reasonable expenses, other than loss of earnings incurred at the Company's request;

and the amounts so incurred, except settlements of claims and suits are payable by the Company in addition to the applicable limit of liability of this policy. In jurisdictions where the Company may be prevented by law or otherwise from carrying out this agreement the Company shall pay any expense incurred with its written consent in accordance with this agreement. The Insured shall promptly reimburse the Company for all sums paid on behalf of the Insured within the retained limit specified in the Declarations

## 3. Limit of Liability

All personal injury, property damage and advertising liability arising out of continuous or repeated exposure to substantially the

same general conditions shall be considered as arising out of one occurrence.

* * *
***SECTION V – Conditions***
* * *

5.    Notice of "Occurrence"

Whenever it appears that an occurrence covered hereunder is likely to involve the Company, written notice shall be sent to the Company as soon as practicable. Such notice shall contain particulars sufficient to identify the Insured and also reasonably obtainable information respecting the time, place and circumstances of the occurrence.

76.    Arrowood Excess Policy No. PLA 102189, effective October 1, 1972 to October 1, 1973 defines "Occurrence" as follows:

**"Occurrence"** means: an event including injurious exposure to conditions, which results, during the policy period in personal injury, property damage or advertising liability, neither expected nor intended from the standpoint of the insured.

77.    Arrowood Excess Policies Nos. PLA 102542, PTQ 302601, PTQ 306451 and PTQ 306452, effective October 1, 1973 to October 1, 1977 define "Occurrence" as follows:

**"Occurrence"** means an accident, including continuous or repeated exposure to conditions, which results in personal injury, property damage or advertising liability neither expected nor intended from the standpoint of the insured.

78.    Arrowood Excess Policy Nos. PHA 010630, effective August 31, 1996 to August 31, 1997, and PHA 013771, effective August 31, 1999 to August 31, 2000 follow form to the underlying Westchester Fire Commercial Umbrella Policy, which provides in relevant part:

**CONDITIONS**

**E. Duties in the Event of "Occurrence", "Claim" or "Suit".**

(1) You must notify us of any "Occurrence" which may result in a "Claim" or "Suit" under this policy. Notice shall include:

  (a) how, when and where the "Occurrence" took place:

  (b) the names and addresses of any injured persons and witnesses: and

  (c) the nature and location of any injury or damage arising out of the "Occurrence."


(2) If a "Claim" is made or "Suit" is brought against any "Insured" that is likely to involve this policy, you must notify us, in writing, of the "Claim" or "Suit" as soon as possible.

(3) You and any other involved "Insureds" must:

  (a) immediately send us copies of any demands, notices, summonses or legal papers received in connection with any "Claim" or "Suit";

  (b) authorize us to obtain records and other information;

  (c) cooperate with us in the investigation, settlement or defense of any "Claim" or "Suit" and

  *　　*　　*

(4) No "Insureds" will except at their own cost, voluntarily make a payment, assume any obligation or incur any expense, other than for first aid, without our consent.

  *　　*　　*

**DEFINITIONS**

D. "Claim" means any demand upon the "Insured" for monetary compensation, whether formal or informal, written or oral, including, without limitation, the service of "Suit" papers or arbitration proceedings against the Insured for monetary compensation alleging liability of the Insured as a result of an "Occurrence" which may or may not be covered by the policy. The term "Claim" does not include reports of accidents or "Occurrences" or any acts, errors, offenses or omissions which may give rise to a "Claim" under this policy.

*　　*　　*

G. "Occurrence" means:

(1) An accident, including continuous or repeated exposure to substantially the same general harmful conditions, that results in "Bodily Injury" or "Property Damage" that is not expected or not intended by the "Insured."

All damages that arise from continuous or repeated exposure to substantially the same general conditions are considered to arise from one "Occurrence".

*　　*　　*

79.　The following policy language is contained in policies PHA 012471 and PHA 013771, effective August 31, 1998 to August 31, 1999 and August 31, 1999 to August 31, 2000, respectively:

### SECTION I — EXCESS LIABILITY INSURANCE

1. Insuring Agreement

a. We will pay those sums in excess of the limits shown in Item 6 of the Declarations, Schedule of Underlying Insurance, that you become legally obligated to pay as damages because of injury to which this insurance applies, provided that the "Underlying Insurance" also applies, or would apply but for the exhaustion of its applicable Limits of Insurance.

b. This insurance is subject to the same terms, conditions, agreements, exclusions and definitions as the "Underlying Insurance", except:
(1) We will have no obligation under this insurance with respect to any claim or suit that is settled without our consent; and
(2) With respect to any provisions to the contrary contained in this insurance.

c. The amount we will pay for damages shall not exceed the Limits of Insurance stated in Item 4. of the Declarations.

d. We will have the right to participate in the defense of claims or suits against you seeking damages because of

22

injury to which this insurance may apply. We will have a duty to defend such claims or suits when the applicable limit of insurance of the "Underlying Insurance" has been exhausted by payment of judgments, settlements and any cost or expense subject to such limit. We may, at our discretion, investigate and settle any claim or suit. Our right and duty to defend end when the applicable limit shown in the Declarations has been used up by our payment of judgments or settlements.

## COVERAGE CORRESPONDENCE AND REQUESTS FOR INFORMATION BETWEEN ARROWOOD AND THE DIOCESE

80.     To date, Arrowood has agreed to participate in the defense of the Diocese and/or Affiliated Entities in numerous Underlying Lawsuits, subject to a reservation of rights.

81.     Specifically, subject to a reservation of rights, Arrowood has agreed to provide a defense to the Diocese, in all Underlying Lawsuits which allege abuse in the Arrowood Policy Periods, and which do not include allegations of abuse by Ferraro. Arrowood has also agreed to provide a defense to certain Affiliated Entities in the Underlying Lawsuits which allege abuse in the Arrowood Policy Periods.

82.     Arrowood has issued RFIs to the Diocese in all Underlying Lawsuits in which it has agreed to participate in the defense of the Diocese and/or the Affiliated Entities, and/or in all Underlying Claims for which it has been provided insufficient information.

83.     The RFIs advise the Diocese that Arrowood does not have sufficient information to fully evaluate the Underlying Actions, and that Arrowood needs information from the Diocese and/or the Affiliated Entities to investigate the Underlying Actions.

84.     Specifically, the RFIs request from the Diocese relevant diocesan and/or Affiliated Entity documents and information regarding the Underlying Actions and the priests accused of sexual abuse in the Underlying Actions.

85.    The RFIs request information which would be in the Diocese's and/or the Affiliated Entities' possession and control, including in part:

- Any and all incident reports, condemnations, and performance reviews, prepared by the Diocese in connection with the alleged abuser;
- All written guidelines, rules, manuals or other documents, whether formal or informal, concerning the Diocese's sexual abuse policy and the handling of sexual abuse claims;
- Any and all documents, information and/or investigative material regarding claims, past or present, asserted against a priest, employee, and/or the Diocese.
- The names of all priests, employees and agents of the Diocese involved in any of the alleged sexual misconduct committed by each abuser or who have been alleged to have had knowledge of the alleged sexual misconduct;
- The names of all priests, employees and/or agents of the Diocese who were suspended from service as a result of the alleged sexual misconduct at issue;
- The personnel files of the alleged abuser.

86.    To date, the Diocese has provided only cursory responses to Arrowood's information requests.

87.    As noted above, despite publicly acknowledging that it has undertaken investigations into individual abuse allegations to determine veracity, and has reached conclusions based on a review of evidence in its possession, the Diocese has decided to 'pick and choose' the documents it will share with Arrowood. Even within the limited "files" it has selected for production, redactions of entire pages obscure information and missing pages gloss over decades worth of history, all without explanation by the Diocese. Indeed, based on the presentation of the limited information provided, it is impossible to discern the true origination of the documents and/or "files" and whether any such information has been provided as it was kept in the ordinary course of the Diocesan records.

88.    Accordingly, Arrowood is unable to properly investigate the Underlying Actions against the Diocese and/or the Affiliated Entities.

**HISTORICAL INFORMATION REGARDING THE DIOCESE'S PRIOR
KNOWLEDGE OF ABUSIVE PRIESTS AND OTHER INDIVIDUALS AND
WIDESPREAD COVERUP OF ITS KNOWLEDGE OF ABUSE**

**A.      The Crime of Solicitation Instruction**

89.      The Holy See, and the Catholic Church at large, has been aware of sexually abusive priests in their midst for at least 100 years.

90.      In 1922, the Holy Office issued an instruction, "Crimen sollicitationis" (The Crime of Solicitation), to its Bishops and other officials of Catholic organizations regarding the handling of cases of solicitation of sex in the confessional. The document mandated a specific procedure for the Holy See's agents, including the Bishop of the Diocese, to use when a cleric abused children using the confessional. The document required strict secrecy and indicates that the Holy See was fully aware that there was a systemic problem of clergy members sexually molesting children using the confessional. A copy of the original Crimen sollicitationis is attached hereto as **Exhibit A**.

91.      In 1962, The Vatican Press published the instruction Crimen sollicitationis for all patriarchs, archbishops, bishops and other diocesan ordinaries "even of the oriental rite" on the manner of proceeding in cases of solicitation. Attached hereto as **Exhibit B** is a copy of the 1962 version of Crimen sollicitationis. The 1922 and 1962 publications of Crimen sollicitationis are collectively referred to as the "Crime of Solicitation Instruction."

92.      Notwithstanding the "publication" of the Crimen sollicitationis, the document itself states that it is "to be diligently stored in the secret archives of the Curia as strictly confidential" *see*, **Exhibit B,** and that "by special delegation of the Apostolic See; and it is enjoined upon them, by an obligation gravely binding in conscience, to ensure that causes of this sort henceforth be introduced, treated and concluded as quickly as possible before their own tribunal." **Id**.

93.     The document makes clear that a high level of priority must be placed on secrecy: "The oath to maintain confidentiality must always be taken in these causes, also by the accusers or complainants and the witnesses. … The Defendant is to be most gravely admonished that he too must maintain confidentiality with respect to all persons, apart from his advocate, under the penalty of suspension *a divinis*, to be incurred *ipso facto* in the event of a violation". **Id.**

94.     The Crime of Solicitation Instruction, paragraph 1, states that "[t]he crime of solicitation takes place when a priest tempts a penitent, whoever that person is, either in the act of sacramental confession, whether before or immediately afterwards, whether on the occasion or the pretext of confession, whether even outside the times for confession in the confessional or [in a place] other than that [usually] designated for the hearing of confessions or [in a place] chosen for the simulated purpose of hearing a confession. [The object of this temptation] is to solicit or provoke [the penitent] toward impure and obscene matters, whether by words or signs or nods of the head, whether by touch or by writing whether then or after [the note has been read] or whether he has had with [that penitent] prohibited and improper speech or activity with reckless daring." (Text in brackets are in brackets in original text). *See*, **Id.**

95.     The section of The Crime of Solicitation Instruction titled "Penalties," paragraph 62, refers to children, stating that "these matters, especially for estimating the gravity of the crime, should be kept before one's eyes, namely: the number of persons solicited and their condition, as, for example, if they are minors in age…" *See*, **Id.**

96.     The section of The Crime of Solicitation Instruction titled "The Worst Crime," paragraph 73, refers to children, stating that "To have the worst crime, for the penal effects, one must do the equivalent of the following: any obscene, external act, gravely sinful, perpetrated in

any way by a cleric or attempted by him with youths of either sex or with brute animals (bestiality)." *See*, **Id.**

97.      According to the Crime of Solicitation Instruction, paragraph 64(d), penalties for child sexual abuse include an order to move abusive priests to other locations: "As often as, in the prudent judgment of the Ordinary, it seems necessary for the amendment of the delinquent, for the removal of the near occasion [of soliciting in the future], or for the prevention of scandal or reparation for it, there should be added a prescription for a prohibition of remaining in a certain place (Canon 2302)." (Text in brackets are in brackets in original text). *See*, **Id.**

98.      In various lawsuits filed against the Diocese, including one entitled *P.F. v. Diocese of Brooklyn*, et. al., Index Number 526614/2019, it is alleged: "The policy of secrecy and the severest of penalties for its violation [as outlined in the Crime of Solicitation] were reiterated in documents issued by officials of the Holy See for the benefit of its agents, including the Bishops of the Diocese of Brooklyn and the Diocese of Rockville Centre, in 1988 and 2001." The Complaint goes on: "transfers and reassignments of Father Ferraro were pursuant to this policy and practice designed to conceal sexual abuse of clergy and protect the [Diocese] from scandal … [i]ndeed, the policy of secrecy and lack of consequences for the sexual abuse of children was perceived as a perquisite by clergy sex abusers. The Holy See and Diocese of Brooklyn … believed it to be perceived as a perquisite, which it condoned and used to its advantage in controlling priests."[3]

**B.      Credibly Accused Priests and the Underlying Actions Alleging Prior Knowledge by The Diocese**

---

[3] All Underlying Actions referenced herein are attached hereto under the "Complaints" section of the attached exhibits.

99.    Since 2017, the Diocese has begun resolving sexual abuse claims through the Independent Reconciliation and Compensation Program for the Compensation of Certain Individual Claims of Clergy Sexual Abuse. ("IRCP"). Attached hereto as **Exhibit C** is a Letter to the Faithful, issued by the Office of the Bishop, Diocese of Brooklyn, regarding their IRCP.

100.    The Diocese has stated publicly that it has settled approximately 500 claims through the IRCP. [4]

101.    On February 15, 2019, the Diocese published a list of 118 priests who served in the Diocese who have been credibly accused of sexually abusing children. This list was updated in September of 2019 and includes additional names. A complete copy of the list is attached hereto as **Exhibit D**.

102.    As acknowledged by the Diocese, "[b]y 'credible' the Diocesan officials believe that the allegations may be true." **Id**. The current sitting Bishop of Brooklyn, Nicholas DiMarzio, notes, "[t]he individuals named on this list have either admitted to sexual misconduct with a minor or have had allegations filed against them that have been found credible by the Diocesan Review Board, or through the IRCP process." See **Exhibit C**. Since August 14, 2019, nearly 500 lawsuits have been filed under the New York Child Victims Act against the Diocese, many of them naming the credibly accused priests.

103.    In building this list, the Diocese undertook an investigation into each and every allegation made against the priests listed, and compared those allegations with information available to the Diocese. Based on this, the Diocese made a determination as to the veracity of those allegations. The Diocese has not provided its investigation documents to Arrowood despite Arrowood's repeated requests for this information, some of which are outstanding for over a year.

---

[4] Window for Abuse Suits in New York Opens, By Andrew Pugliese, available at https://thetablet.org/window-abuse-suits-new-york-opens/, accessed July 9, 2020.

104.     In fact, several of the same priests contained in this list are accused of abuse in multiple Underlying Actions for which Arrowood is providing a defense subject to a reservation of rights. Further, in the Underlying Actions, the Diocese and/or the Affiliated Entities are alleged to have had prior knowledge of abuse and/or pedophilia by these priests.

105.     The Diocese has provided Arrowood with few, incomplete files, notwithstanding the fact that Arrowood's RFIs were first issued over 18 months ago. Arrowood is defending the Diocese in numerous CVA suits and has asked for information in each of these suits. Many of the files provided are incomplete and contain unexplained and/or unsupported redactions and information gaps with missing documents.

106.     In this declaratory judgment action, Arrowood seeks a declaration that it has no obligation to defend and/or indemnify the Diocese and/or the Affiliated Entities for the Underlying Actions involving sexually abusive priests previously known to the Diocese, including, but not limited to, those outlined below.

### 1.     Father Romano Ferraro

107.     The conduct of Ferraro is at issue in 19 Underlying Actions. The Diocese has tendered 16 of those suits to Arrowood as well as three (3) claims and an unsettled IRCP claim.

108.     Specifically, the following Underlying Lawsuits involving Ferraro have been tendered to Arrowood:

- 517898/2019 – Charles Marri v. Diocese of Brooklyn, et. al.
- 520009/2019 – DiGorgio v. Diocese of Brooklyn, et. al.
- 520730/2019 – B.K. v. Diocese of Brooklyn, et. al.
- 520731/2019 – S.S. v. Diocese of Brooklyn, et. al.
- 520879/2019 – W.B. v. Diocese of Brooklyn, et. al.
- 524463/2019 – G.H. v. Diocese of Brooklyn, et. al.
- 526614/2019 – P.F. v. Diocese of Brooklyn, et. al.
- 503282/2020 – Costa v. Diocese of Brooklyn, et. al.
- 501952/2020 – S.O. v. Diocese of Brooklyn, et. al.

- 507222/2020 – Ark124 Doe v. Diocese of Brooklyn, et. al.
- 507283/2020 – Ark148 Doe v. Diocese of Brooklyn, et. al.
- 508058/2020 – R.M. v. Diocese of Brooklyn, et. al.
- 512747/2020 – Nicolas Nabel v. Diocese of Brooklyn, et. al.
- 512675/2020 – PC-25 Doe v. Diocese of Brooklyn, et. al.
- 512125/2020 – B.R. v. Diocese of Brooklyn, et. al.
- 519885/2020 – B.K. v. Diocese of Brooklyn, et. al.

109. In addition, Ferraro has been named as the abuser in several pre-CVA lawsuits filed against the Diocese, as well as a number of separate lawsuits filed against the Diocese of Rockville Centre.

110. Currently, upon information and belief, Ferraro is serving a life sentence in the custody of the Massachusetts Department of Corrections on three counts of indecent assault and battery against a child under 14. He was convicted following a trial. As detailed below, it is alleged by various plaintiffs that the Diocese and/or the Affiliated Entities were aware of Ferraro's sexual proclivities as early as the 1950's. Arrowood seeks a declaration herein that it has no obligation to defend and/or indemnify the Diocese and/or the Affiliated Entities under the Arrowood Policies for Underlying Actions alleging abuse by Ferraro.

111. It is alleged that Ferraro entered the seminary in or around 1954 and was ordained a priest in May of 1960. *See, S.S. v. Diocese of Brooklyn, et al.*, Supreme Court of the State of New York, County of Kings, Index No. 520731/2019, Complaint ¶ 7 (the "*S.S.* Complaint"). It is alleged in certain of the Underlying Actions, including *S.S.* that prior to ordination, Ferraro left the seminary because he grew conflicted over his proclivity for boys. *Id*. Diocesan officials allegedly convinced Ferraro to nonetheless continue pursuing his career in priesthood. *Id*.

112.     Attached hereto as **Exhibit E** is the Affidavit of A.W. Richard Sipe[5], which gives a detailed and comprehensive overview of Ferraro's career and the ample evidence indicating the Diocese's awareness of his proclivities ("the Sipe Affidavit"). Sipe's Affidavit is a public record and can be accessed at http://www.bishop - accountability.org/docs/brooklyn/Ferraro__Rev_Romano/2009_06_10_Sipe_Ferraro_Affidavit.p df (last accessed July 9, 2020).

113.     Sipe concluded that there was "serious doubt on the part of [Ferraro's] superiors about the suitability of [Ferraro] for the priesthood" in the 1950's. *Id*, Page 4.

114.     According to the Sipe Affidavit, the Diocese of Brooklyn had ample evidence of Ferraro's proclivities. Sipe's 56-page affidavit concludes that:

> The Diocese of Brooklyn took a chance on ordaining Romano Ferraro to the priesthood after there were many indications of the risks of his personality and character even while he was in the seminary. He registered his own doubts about his ability to be a priest and his homosexual attraction to boys prior to ordination. The Diocese transferred him from parish to parish after complaints of troublesome behavior and need for psychological treatment and "grace." Ferraro's entrance into the Navy was no accident. The pattern and practice of many dioceses was to allow or encourage sexually active priests to enlist in the armed forces. Part of the pattern was to control or avoid local scandal, but another motivation was the hope that the experience would "make a man" of the homosexual. Even after there were specific complaints of abuse of minors the diocese transferred him to pastoral activity in another diocese. The bishops and the Diocese of Brooklyn failed to supervise this troubled man and neglected to warn parishes where he served of his problems and the danger he presented to children.

> *See* **Exhibit E**

---

[5] A.W. Richard Sipe was an American Benedictine monk-priest for 18 years, a psychotherapist and author of six books about Catholicism and clerical sexual abuse in the Catholic Church. Sipe died on August 8, 2018.

115.    The historical backdrop set forth in the Sipe Affidavit is borne out in the Underlying Lawsuits that have been thus far filed against the Diocese. According to a recently filed lawsuit, in or around 1958 to 1962, while at St. Joseph Patron, Ferraro sexually assaulted, abused and/or had sexual contact with a minor child, Charles Marri ("Marri"). *See Charles Marri v. Diocese of Brooklyn and Queens, et al*., Supreme Court of the State of New York, County of Kings, Index No. 517898/2019, Complaint ¶ 69 (the "*Marri* Complaint"). The *Marri* Complaint alleges that "[t]he Diocese knew and/or reasonably should have known, and/or knowingly condoned, and/or covered up, the inappropriate and unlawful sexual activities of Ferraro who sexually abused Marri." *Id*. ¶ 96

116.    In or around 1965 to 1968, following his transfer to the Holy Family Church, Ferraro allegedly would pick boys up in his van to take them swimming, at which time he would expose his genitalia to the boys. *See, W.B. v. Diocese of Brooklyn, et al.*, Supreme Court of the State of New York, County of Kings, Index No. 520879/2019, ¶17 (the "*W.B.* Complaint").

117.    Additionally, W.B. alleges he was sexually assaulted (including oral sex) multiple times when he was 12 – 14 years old. *Id*. ¶ 18.

118.    The *W.B.* Complaint alleges that the Bishop of the Diocese "at all relevant times knew that Priests of the Diocese, under his supervision and control, were grooming and sexually molesting children with whom the Priests would have contact in their ministry and pastoral functions." *Id*. ¶ 20.

119.    In or around 1966, Ferraro allegedly sexually abused S.S. when he was an altar boy after mass and while wrestling, grabbing and fondling S.S.'s genitalia. *See S.S.* Complaint.

120.     It is alleged that Ferraro groomed the mother of S.S. to gain her trust, and subsequently made frequent visits to the home at night and would sexually assault S.S. in his bedroom. *Id*. ¶ 19.

121.     The *S.S.* Complaint alleges that the Bishop of the Diocese "at all relevant times knew that Priests of the Diocese, under his supervision and control, were grooming and sexually molesting children with whom the Priests would have contact in their ministry and pastoral functions." *Id*. ¶ 20.

122.     According to the *W.B.* Complaint, "Father Ferraro was assigned to the United States Navy as a Military Chaplain in or about 1968". *See, W.B.* Complaint, ¶10.

123.     As alleged in the *B.K.* Complaint, in or around 1970, Ferraro "was dishonorably discharged from the Navy … based on an allegation of child sexual abuse". *See, B.K.* v. *Diocese of Brooklyn, et al.,* Supreme Court of the State of New York, County of Kings, Index No. 520730/2019, ¶9 (the "*B.K.* Complaint").

124.     After leaving the Navy, it is alleged that Ferraro was assigned by the Diocese to St. Rose of Lima Parish in or about 1970. *See, B.K.* Complaint, ¶10.

125.     In the early 1970's, Ferraro allegedly sexually assaulted B.K. when he was "12 and 13 years old in 7th grade… in at least two incidents." *Id*. ¶ 18. In one incident, "Ferraro had Plaintiff sit in his lap and drive his vehicle in the Church parking lot, where he grinded and rubbed his genitalia against Plaintiff seeking sexual gratification." *Id.* The other incident allegedly occurred in the school's auditorium/lunchroom where Ferraro fondled Plaintiff's genitalia under his pants. *Id.* It is alleged that the Bishop of the Diocese "at all relevant times knew that Priests of the Diocese, under his supervision and control, were grooming and sexually molesting children with whom the Priests would have contact in their ministry and pastoral functions." *Id*. ¶ 19.

126.     In or around 1973, it is alleged that Ferraro was removed from his position as a Priest at St. Rose of Lima after an allegation of child sexual abuse. *Id.* ¶ 13.

127.     On or around 1974, Ferraro allegedly sexually abused Peter DiGiorgio (*Peter DiGiorgio v. Roman Catholic Diocese of Brooklyn,* Supreme Court of the State of New York, County of Kings, Index No. 520009/2019, Complaint ¶ 19) (the "*DiGiorgio* Complaint"). The *DiGiorgio* Complaint further alleges that [the Diocese] … knew and/or reasonably should have known and/or knowingly condoned and/or covered up, the inappropriate and unlawful sexual activities of [Ferraro]." *Id.* at ¶ 22

128.     The *DiGiorgio* Complaint alleges that "Defendants, Roman Catholic Diocese of Brooklyn and St. Rose of Lima Church, were put on notice of Father Romano J. Ferrara's [sic] improper and inappropriate actions towards minors." *Id.* at ¶ 39.

129.     "In approximately 1988-89, after yet another allegation of child sexual abuse, the Diocese sent Ferraro to St. Luke Institute, an evaluation and treatment facility for pedophile clergy in Maryland." See, *B.K.* Complaint at ¶ 12.

130.     The *B.K.* Complaint alleges that the Diocese's "acts and omissions provided Ferraro with the opportunity to commit foreseeable acts of child sexual abuse or assault on Plaintiff." *See, B.K.* Complaint at ¶ 17.

131.     The *B.K.* Complaint alleges that the Bishop of the Diocese at all relevant times knew that this was a widespread, ubiquitous and systemic problem in the Diocese, involving many Priests and numerous victims." *See, B.K.* Complaint at ¶ 19.

132.     The *B.K.* Complaint alleges that the Diocese: "knew a significant percentage of Priests were using their status and position to identify, recruit, groom and sexually assault vulnerable children in the church" and "concealed this knowledge, and failed to adopt policies and

procedures that would protect children and reduce the risk of child sexual abuse by its priests," such that "[a]ll children engaging in Catholic activities within the Diocese were in this manner placed at risk of child sexual abuse." *See,* B.K. Complaint at ¶ 37-39.

133.    The *Marri* Complaint alleges that The Diocese "knew and/or reasonably should have known, and/or knowingly condoned, and/or covered up, the inappropriate and unlawful sexual activities of Ferraro who sexually abused Plaintiff." *See, Marri* Complaint at ¶ 96.

134.    The *W.B.* Complaint alleges that "it was reasonably foreseeable to the Diocese of Brooklyn and the Church that Ferraro would commit acts of child sexual abuse and assault on children," and that "the Diocese's and Church's acts and omissions provided Ferraro with the opportunity to commit foreseeable acts of child sexual abuse or assault on Plaintiff." *See, W.B.* Complaint at ¶ 14-16.

135.    The *W.B.* Complaint further alleges that the Diocese took affirmative actions to withhold information regarding known abusers: "despite receiving credible allegations of child sexual abuse against Priests, the Diocese acted to conceal these allegations in an effort to avoid scandal and accountability." *See, W.B.* Complaint at ¶ 21.

136.    The *B.K.* Complaint alleges that "Ferraro was arrested in 2002 for the sexual abuse of a boy seven years old in Massachusetts, convicted, and sentenced to life in prison." *Id.* ¶ 13.

137.    As alleged in the *B.K.* Complaint, consistent with the Crime of Solicitation Instruction paragraph 64(d), "the Diocese's transfers and reassignments of Ferraro were pursuant to [the Diocese's] policy and practice designed to conceal sexual abuse of clergy and protect the Diocese from scandal." *See*, *B.K.* Complaint at ¶ 31.

138.    Upon information and belief, Ferraro was transferred on at least nineteen occasions from 1960 to 2002 to different parishes or locations as follows:

**1960-1962** — St. Joseph Patron of the Universal Church (Brooklyn, NY)
**1962-1963** — St. Rosalia (Brooklyn, NY)
**1963-1964** — Regina Pacis Votive Shrine (Brooklyn, NY)
**1965-1968** — St. Lucy (Brooklyn, NY)
**1965-1968** — Holy Family Church (Brooklyn, NY)
**1968-1970** — U.S. Army Chaplin & military service
**1968-1969** — U.S. Naval Air Station (Key West, FL)
**1971-1973** — St. Rose of Lima (Queens, NY)
**1973-1975** — Sick leave and attended Cathedral College for Master's degree
**1975-1977** — St. Joseph (Kings Park, NY)
**1977-1978** — St. Francis Xavier (Brooklyn, NY)
**1978-1979** — St. Aloysius (Queens, NY)
**1980-1981** — House of Affirmation (Webster Groves, MO)
**1981-1983** — St. Joan of Arc (St. Louis, MO)
**1983** — St. Francis Xavier (Bronx, NY)
**1984** — St. James (Woodbridge, NJ)
**1984-1985** — Our Lady of Mount Virgin (Middlesex, NJ)
**1985-1986** — St. John Vianney (Colonia, NJ)
**1986-1987** — Christ the King (Commack, NY)
**1987-1988** — St. Rita's (Staten Island, NY).
**1989** — St. Luke Institute (Suitland, MD) (as a patient)
**1989-2002** – Parsons Manor (Jamaica, NY)
**May 20, 2004** — MCI-Cedar Junction (maximum security prison) (South Walpole, MA)

139.    As a result of Ferraro being transferred out of the Diocese, a number of other actions have been filed against other New York Roman Catholic Church Dioceses alleging sexual abuse of a minor by Ferraro: *See*, *G.C. v. Diocese of Rockville Centre a/k/a John Barres, as Bishop and Corporate Sole of the Diocese of Rockville Centre; St. Joseph's Parish Old Roman Catholic Church*, Supreme Court of the State of New York, Nassau County, Index No. 900035/2019, ("*G.C. Complaint*"); *Ark203 Doe v. Archdiocese Of New York, St. Rita, Does 1-5 Whose Identities Are Unknown To Plaintiff*, Supreme Court of the State of New York, New York County, Index No. 950163/2020, ("*Ark203 Complaint*"); *see also*, *Thomas Kelly v. Diocese of Rockville Centre, St. Joseph's Parish, Romano Ferraro, Fr. Fitzgerald, and Fr. Butler*, filed in the Supreme Court of the State of New York, Nassau County, Index No. 900064/2019 ("*Kelly Complaint*").

140. The *G.C.* Complaint alleges that Ferraro was a "serial sexual predator who sexually abused multiple boys over a period of decades," including abusing Plaintiff, G.C. from approximately 1975 to 1976 at St. Joseph's Parish in Kings Park, New York. *See*, *Id.* at ¶ 8-9. The *G.C.* Complaint further alleges the Diocese of Rockville Centre "knew or should have known that Ferraro was unfit, dangerous, and a threat to the health, safety, and welfare of the minors entrusted to his counsel, care and/or protection," and that the Diocese [of Rockville Centre] "gave him the opportunity to commit foreseeable acts of child sexual abuse or assault." See, *Id.* at ¶ 14-16. The Complaint further alleges that Ferraro was sent to the Diocese of Rockville Centre after he had abused a young boy in Brooklyn: "In 1971, during his priestly assignment at St. Rose of Lima in Brooklyn, he sexually abused a young boy. This prompted Father Ferraro's transfer to the Church where Plaintiff was sexually abused for a period of years." *See* Id at ¶11.

141. The *Kelly* Complaint alleges that in or around the year 1971, when Plaintiff was approximately 12 years old, Ferraro engaged in unpermitted sexual contact with Plaintiff. According to the *Kelly* Complaint, "Defendant Diocese [of Rockville Centre] intentionally accepted Defendant Ferraro Romano into their Dioceses from the Diocese of Brooklyn, amounting to a criminal conspiracy to hide and otherwise keep quiet from the public in general, and the Diocese community, known facts of criminal sexual past practices, known sexual tendencies, and likely future sexual tendencies as to young boys and other children in the diocese community and their relative church establishments." See *Kelly* Complaint at ¶83.

142. Attached as **Exhibit F** is a list of the lawsuits filed against the Diocese since August 14, 2019 which allege sexual abuse of minors by Ferraro, and which were tendered to Arrowood.

143. Arrowood has no obligation to defend and/or indemnify the Diocese and/or the Affiliated Entities for the Underlying Actions alleging abuse by Father Romano Ferraro because

the abuse that is the subject of these Actions was known by the Diocese and/or the Affiliated Entities to be certain or substantially certain to occur; the alleged injury from the abuse was expected or intended; and was otherwise not fortuitous; and neither an "occurrence" nor an "accident" has been alleged as required by the Arrowood Policies.

144.    For these reasons, Arrowood has disclaimed any obligation to defend and/or indemnify the Diocese and/or the Affiliated Entities in sixteen (16) lawsuits alleging abuse by Ferraro.

## 2.    Father Thomas O'Rourke

145.    Since August 14, 2019, seven (7) lawsuits have been tendered to Arrowood that have been filed against the Diocese and/or the Affiliated Entities by Plaintiffs alleging they were sexually abused as children by Father Thomas O'Rourke ("O'Rourke"). Additionally, O'Rourke has been publicly acknowledged by the Diocese to be a "clergy for whom the diocese received allegations of sexual misconduct with a minor". *See* **Exhibit D.** According to this list, O'Rourke died in 1998.

146.    Specifically, O'Rourke has been named in the following tendered suits:

- 517888/2019 – Ark39 Doe v. Diocese of Brooklyn, et. al.
- 517915/2019 – Ark58 Doe v. Diocese of Brooklyn, et. al.
- 517916/2019 – Ark52 Doe v. Diocese of Brooklyn, et. al.
- 517926/2019 – Joseph Marino v. Diocese of Brooklyn, et. al.
- 518099/2019 – Ark23 Doe v. Diocese of Brooklyn, et. al.
- 519792/2019 – Ark107 Doe v. Diocese of Brooklyn, et. al.
- 716003/2019 – John Reidy v. Diocese of Brooklyn, et. al.

147.    Each of the seven (7) lawsuits against the Diocese regarding O'Rourke allege that at various times throughout his career, O'Rourke sexually abused the respective Plaintiffs while they were minors. *See*, e.g., *Ark52 Doe v. The Roman Catholic Diocese of Brooklyn, Corpus*

*Christi Church,* Supreme Court of the State of New York, County of Kings, Index #:517916/2019, Complaint ("*Ark52* Complaint").

148.     The *Ark52* Complaint alleges that Roman Catholic Church officials, including the Diocese, "have used their power and influence to prevent victims and their families from disclosing allegations of abuse." *See*, *Ark52* Complaint at ¶13.

149.     The *Ark52* Complaint alleges that the Diocese "breached their duty to Plaintiff by failing to warn Plaintiff and Plaintiff's family of the risk that Fr. O'Rourke posed and the risks of child sexual abuse in Catholic institutions. They also failed to warn them about any of the knowledge that Defendants had about child sexual abuse." *See*, *Ark52* Complaint at ¶31.

150.     The *Ark23* Complaint, which also alleges abuse by O'Rourke, alleges that the Diocese and Affiliated Entity: "knew or should have known that Defendants had numerous agents who had sexually molested children. Defendants knew or should have known that child molesters have a high rate of recidivism. They knew or should have known that there was a specific danger of child sex abuse for children participating in their youth programs. *See*, *Ark23 Doe v. The Roman Catholic Diocese of Brooklyn, et al.*, Supreme Court of the State of New York, County of Kings, Index #: 518099/2019, Complaint. ("*Ark23* Complaint.") *Also see*, *Ark39 Doe v. The Roman Catholic Diocese of Brooklyn, et al*. Index #: 517888/2019; *Ark58 Doe v. The Roman Catholic Diocese of Brooklyn, et al*. Index #: 517915/2019; and *Ark107 Doe v. The Roman Catholic Diocese of Brooklyn, et al.* Index #: 519792/2019.

151.     John Reidy alleges he was abused by O'Rourke in 1963 and 1964, while a minor. *See*, *John Reidy v. Roman Catholic Diocese of Brooklyn et al.*, Index No. 716003/2019 ("*Reidy* Complaint").

152.     The *Reidy* Complaint alleges that the Diocese "aided and abetted the concealment of criminal conduct by failing and refusing to report allegations of child sexual abuse to appropriate New York civil authorities. *See*, *Reidy* Complaint at ¶23.

### 3.     Father Vincent Sforza

153.     Father Vincent Sforza ("Sforza") is the subject of four Underlying Lawsuits and two Underlying Claims that have thus far been tendered to Arrowood.

154.     Specifically, Sforza has been named in the following Underlying Lawsuits tendered to Arrowood:

- 524832/2019 – Delaney v. Diocese of Brooklyn, et. al.
- 400009/2020 – DiMaria v. Diocese of Brooklyn, et. al.
- 512747/2020 – Nicolas Nabel v. Diocese of Brooklyn, et. al.
- 514547/2020 – Harry Geoghegan v. Diocese of Brooklyn, et. al.

155.     Sforza was included in the 2019 Diocese list of priests credibly accused of sexual abuse. *See*, **Exhibit D**. According to this list, Sforza died in 2010.

156.     Following numerous allegations of abusing minors, Sforza was laicized by the Diocese on January 14, 1977 and was never reinstated.

157.     Public records indicate that Sforza was moved to five different parishes throughout his career between 1961 and 1977.

### 4.     Father James Sickler

158.     Father James Sickler ("Sickler") has been named as defendant in three separate lawsuits tendered to Arrowood by the Diocese.

159.     Specifically, Sickler has been named in the following tendered suits:

- 518050/2019 – John Mcguire v. Diocese of Brooklyn, et. al.
- 522706/2019 – V.J.D. v. Diocese of Brooklyn, et. al.
- 400031/2019 – T.H. v. Diocese of Brooklyn, et. al.

160.   Sickler is included in the 2019 Diocese list of priests credibly accused of sexual abuse. *See*, **Exhibit D**. According to this list, Sickler died in 1996.

161.   Public records indicate that Sickler was moved to at least nine different parishes throughout his career, including:

- **1953-1954**: St. Frances de Chantal, Wantagh, NY
- **1955-1959**: Good Shepherd, Brooklyn, NY
- **1960-1965**: St. Pancras, Glendale, NY
- **1966-1969**: St. Gabriel, East Elmhurst, NY
- **1970**: Blessed Sacrament, Jackson Heights, NY
- **1971-1979**: St. Rose of Lima, Brooklyn, NY
- **1980-1983**: St. Saviour's, Brooklyn, NY
- **1984-1994**: St. Ann's, Queens, NY
- **1995-1996**: St. Finbar's, Brooklyn, NY

162.   Plaintiff, John McGuire alleges he was sexually abused as a child by Sickler in 1959 or 1960. *See*, *John McGuire v. Roman Catholic Diocese of Brooklyn, New York*, Supreme Court of the State of New York, County of Kings, Index #: 518050/2019 ("McGuire Complaint.")

163.   McGuire alleges he was sexually abused by Sickler when Plaintiff was approximately nine years old, during the school year of 1959 to 1960 while in the fourth grade and in the church choir. *See*, *McGuire* Complaint at ¶9.

164.   The *McGuire* Complaint alleges that Sickler would lurk outside the church and wait for the boys to come out of the church after choir practice. *See*, *McGuire* Complaint at *Id.*

165.   McGuire alleges that "Brooklyn Diocese knew of the past complaints of sexual abuse or should have known about such sexual abuse and moved Sickler from church parish to other church parish to hide and cover up Stickler's sexual abuse allegations; placing others such as plaintiff in danger of sexual abuse by Sickler". *See*, *McGuire* Complaint at ¶10.

166.     The *McGuire* Complaint further alleges that: "Defendant Brooklyn Diocese undertook a continuous course of action in the form of conscious decisions, with subjective knowledge and awareness of the risks and hazards presented by each decision as discussed above and incorporated herein, to expose Plaintiff and others to sexual abuse and/or sexual assault, and exercised not even slight care or diligence". *See*, *McGuire* Complaint at ¶20.

167.     Arrowood has no obligation to defend and/or indemnify the Diocese and/or the Affiliated Entities for the Underlying Actions alleging abuse by Fathers O'Rourke, Sforza and/or Sickler, because the abuse that is the subject of these Actions was known by the Diocese and/or the Affiliated Entities to be certain or substantially certain to occur; the alleged injury from the abuse was expected or intended; and was otherwise not fortuitous.

168.     Similarly, Arrowood has no obligation to defend and/or indemnify the Diocese and/or the Affiliated Entities for the Underlying Actions alleging abuse by other known abusive priests, because the abuse that is the subject of those Actions was known by the Diocese and/or the Affiliated Entities to be certain or substantially certain to occur; the alleged injury from the abuse was expected or intended; and was otherwise not fortuitous.

169.     Further, Arrowood has no obligation to defend and/or indemnify the Diocese and/or the Affiliated Entities in Underlying Actions alleging abuse by Fathers O'Rourke, Sforza and/or Sickler, as neither an "occurrence" nor an accident has been established as required under the Arrowood Policies.

170.     Finally, Arrowood has no obligation to defend and/or indemnify the Diocese and/or the Affiliated Entities in Underlying Actions alleging abuse by known abusive priests, as neither an "occurrence" nor an accident has been established in those cases as required under the Arrowood Policies.

## **ACTUAL CONTROVERSY**

171.     Arrowood has no obligation to defend and/or indemnify the Diocese and/or the Affiliated Entities for "bodily injury" not caused by an "occurrence" as defined in the Arrowood Primary Policies and Arrowood Excess Policies.

172.     Arrowood has no obligation to defend and/or indemnify the Diocese and/or Affiliated Entities for "bodily injury" expected or intended from the standpoint of the insured.

173.     Arrowood has no obligation to defend and/or indemnify the Diocese and/or Affiliated Entities for "bodily injury" not caused by an "accident."

174.     Arrowood has no obligation to defend and/or indemnify the Diocese and/or Affiliated Entities for "bodily injury" which was non-fortuitous.

175.     Arrowood has no obligation to defend and/or indemnify the Diocese and/or Affiliated Entities in the Underlying Actions under the Arrowood Policies because the Diocese has breached its duty to cooperate with Arrowood as required by each of these policies.

176.     Arrowood has no obligation to defend and/or indemnify the Diocese and/or Affiliated Entities under the Arrowood Policies for certain Underlying Actions, to the extent the Diocese and/or Affiliated Entities did not provide Arrowood with timely notice as required under these policies for the claims and/or abuse alleged in those Underlying Actions.

177.     Arrowood has no obligation to defend and/or indemnify any Affiliated Entities in the Underlying Actions who are not insureds under the applicable Arrowood Polices.

178.     Arrowood is entitled to pro-rata allocation of defense costs and/or indemnity costs in certain Underlying Lawsuits.

179.     An actual controversy exists between Arrowood and the Diocese concerning the question of whether Arrowood has any obligation to defend and/or indemnify the Diocese and/or the Affiliated Entities with respect to the Underlying Actions.

## FIRST CAUSE OF ACTION

**(Declaratory Judgment – No Duty to Defend or Indemnify the Diocese and the Affiliated Entities for Underlying Actions alleging abuse by Father Romano Ferraro)**

180.     Arrowood repeats and incorporates by reference the allegations in paragraphs 1 through 179 of the Complaint as though fully set forth again herein.

181.     Arrowood has no obligation to defend and/or indemnify the Diocese and Affiliated Entities for Underlying Actions alleging abuse by Father Romano Ferraro**.**

182.     Ferraro has been accused of sexually abusing minors on multiple occasions in the Underlying Actions.

183.     The Diocese and/or the Affiliated Entities engaged in a pattern of continuously reassigning and transferring Ferraro on at least nineteen (19) occasions despite knowledge that he was a pedophile.

184.     The Diocese and Affiliated Entities allowed and cultivated a culture of opportunity for Ferraro to sexually abuse children.

185.     The Diocese and Affiliated Entities failed to investigate prior allegations of sexual abuse of children by Ferraro, and failed to report the abuse to the authorities.

186.     The *DiGiorgio* Complaint alleges that "Defendants, Roman Catholic Diocese of Brooklyn and St. Rose of Lima Church, were put on notice of Father Romano J. Ferrara's [sic] improper and inappropriate actions towards minors." *See*, *DiGiorgio* Complaint at ¶ 39

187.     The *Marri* Complaint alleges that The Diocese and St. Joseph Patron of the Universal Church "knew and/or reasonably should have known, and/or knowingly condoned, and/or covered up, the inappropriate and unlawful sexual activities of Ferraro who sexually abused Plaintiff." *See, Marri* Complaint at ¶ 96.

188.     The *W.B.* Complaint alleges that "it was reasonably foreseeable to the Diocese of Brooklyn and the Church that Ferraro would commit acts of child sexual abuse and assault on children," and that "the Diocese's and Church's acts and omissions provided Ferraro with the opportunity to commit foreseeable acts of child sexual abuse or assault on Plaintiff." *See, W.B.* Complaint at ¶ 14-16.

189.     It is alleged that despite receiving credible allegations of sexual abuse of children by Ferraro, the Diocese and certain Affiliated Entities named in the Underlying Actions alleging abuse by Father Romano Ferraro, acted to conceal these allegations in an effort to avoid scandal and accountability.

190.     As stated in the Sipe Affidavit, Ferraro "was assigned to 4 parishes in the first 8 years after ordination. Ferraro has since admitted that his transfers were ordered after allegations of sexual abuse arose, consistent with a pattern I personally observed in the church". See **Exhibit E**.

191.     Arrowood has no obligation to defend and/or indemnify the Diocese and/or the Affiliated Entities for the Underlying Actions alleging abuse by Ferraro, as set forth in **Exhibit F**, because it is alleged that the abuse that is the subject of these suits was known by the Diocese and/or the Affiliated Entities to be certain or substantially certain to occur, and therefore the alleged injury from the abuse was expected or intended; and was otherwise not fortuitous.

192.     For these reasons, the injuries alleged in the Underlying Actions as a result of alleged abuse by Ferraro do not arise from an "occurrence," nor do they arise from an accident, as defined by the Arrowood Policies.

193.     Accordingly, Arrowood requests that this Court declare that Arrowood has no obligation under the Arrowood Policies to defend and/or indemnify the Diocese and the Affiliated Entities for the Underlying Actions alleging abuse by Father Romano Ferraro.

## SECOND CAUSE OF ACTION

**(Declaratory Judgment – No Duty to Defend and/or Indemnify the Diocese and Affiliated Entities for Underlying Actions Regarding Other Abusive Priests Previously Known to the Diocese, including, but not limited to, Thomas O'Rourke, Vincent Sforza, and James Sickler)**

194.     Arrowood repeats and incorporates by reference the allegations in paragraphs 1 through 193 of the Complaint as though fully set forth again herein.

195.     Arrowood has no obligation to defend and/or indemnify the Diocese and/or the Affiliated Entities for Underlying Actions involving other abusive priests previously known to the Diocese.

196.     Such other abusive priests previously known to the Diocese and/or the Affiliated Entities include, but are not limited to, Father Thomas O'Rourke, Father Vincent Sforza, and Father James Sickler.

197.     O'Rourke, Sforza, Sickler, and others like them, were previously known to the Diocese and/or the Affiliated Entities, have been accused of sexually abusing minors on multiple occasions in the Underlying Actions, and should not have been permitted to continue in ministry.

198.     It is alleged that the Diocese engaged in a pattern of continuously reassigning and transferring priests like O'Rourke, Sforza and Sickler to other parishes and locations.

199.    Upon information and belief, the Diocese and Affiliated Entities failed to investigate prior allegations of sexual abuse of children by O'Rourke, Sforza, Sickler, and others like them, and failed to report the abuse to the authorities.

200.    Certain of the Underlying Actions allege that the Diocese and Affiliated Entities allowed and cultivated a culture of opportunity for O'Rourke, Sforza, Sickler, and others like them, to sexually abuse children.

201.    As stated above, the Underlying Actions further allege that despite receiving credible allegations of sexual abuse of children by O'Rourke, Sforza, Sickler, and others, the Diocese and/or the Affiliated Entities acted to conceal these allegations in an effort to avoid scandal and accountability.

202.    Arrowood has no obligation to defend and/or indemnify the Diocese and the Affiliated Entities for the Underlying Actions alleging sexual abuse by O'Rourke, Sforza, Sickler, and/or any other known abusers, because the abuse(s) committed by these individuals that is(are) the subject of these suits was known by the Diocese and/or the Affiliated Entities to be certain or substantially certain to occur; the alleged injury from the abuse was expected or intended; and was otherwise not fortuitous.

203.    For these reasons, the injury alleged in the Underlying Actions as to sexual abuse by O'Rourke, Sforza, Sickler, and other known abusers, does not arise from an "occurrence," and is not accidental as required by the Arrowood Policies.

204.    Accordingly, Arrowood requests that this Court declare that Arrowood has no obligation under the Arrowood Policies to defend and/or indemnify the Diocese and the Affiliated Entities for the Underlying Actions involving O'Rourke, Sickler, Sforza, and other known abusers.

**THIRD CAUSE OF ACTION**

**(Declaratory Judgment – Arrowood Has No Duty to Defend and/or Indemnify the Diocese and the Affiliated Entities in the Underlying Actions Under the Arrowood Primary Policies and the Arrowood Excess Policies, Because the Diocese and the Affiliated Entities have Breached their Duty to Cooperate with Arrowood As Required By These Policies)**

205. Arrowood repeats and incorporates by reference the allegations in paragraphs 1 through 204 of the Complaint as though fully set forth again herein.

206. The Arrowood Primary Policies and the Arrowood Excess Policies obligate the Diocese and/or the Affiliated Entities to cooperate with Arrowood in its investigation of the Underlying Actions.

207. As detailed above, the Arrowood Policies contain provisions requiring the Diocese and/or the Affiliated Entities to cooperate with Arrowood's investigation of the Underlying Actions.

208. The Diocese and the Affiliated Entities are obligated to provide Arrowood with documents, records, and other information related to Arrowood's investigation of the Underlying Actions.

209. In certain of the Underlying Actions, Arrowood has agreed to participate in the defense of the Diocese, and in some cases the Affiliated Entities as well, under a reservation of rights.

210. Arrowood has advised the Diocese and the Affiliated Entities that it does not have sufficient information to fully evaluate the Underlying Actions and has sent to the Diocese and the Affiliated Entities RFIs in those Underlying Actions in which it has agreed to participate in the defense of the Diocese and/or the Affiliated Entities or in which it is been provided insufficient information.

211.     The RFIs seek in part: reports by the Diocese and/or Affiliated Entities to authorities regarding allegations of child abuse by priests; internal investigations by the Diocese and/or Affiliated Entities as to allegations of abuse; guidelines, rules, manuals or other documents, whether formal or informal, concerning the Diocese's sexual abuse policy and the handling of sexual abuse claims; personnel files or employment records of known abusive priests; correspondence by the Diocese and/or Affiliated Entities regarding known abusive priests; and communications between the Diocese and/or Affiliated Entities and its employees and representatives and any third-party concerning any alleged sexual misconduct involving priests.

212.     The RFIs request information which would be in the Diocese's and/or Affiliated Entities' possession and control, including in part:

- Any and all incident reports, condemnations, and performance reviews, prepared by the Diocese in connection with the alleged abuser;
- All written guidelines, rules, manuals or other documents, whether formal or informal, concerning the Diocese's sexual abuse policy and the handling of sexual abuse claims;
- Any and all documents, information and/or investigative material regarding claims, past or present, asserted against a priest, employee, and/or the Diocese.
- The names of all priests, employees and agents of the Diocese involved in any of the alleged sexual misconduct committed by each abuser or who have been alleged to have had knowledge of the alleged sexual misconduct;
- The names of all priests, employees and/or agents of the Diocese who were suspended from service as a result of the alleged sexual misconduct at issue;
- The personnel files of the alleged abuser.

213.     Upon information and belief, in September of 2018, the New York Attorney General issued subpoenas to each Roman Catholic Diocese in New York, including the Brooklyn Diocese, as part of an investigation into the handling of sex abuse allegations.

214.     As noted above, the Diocese's response to the Attorney General subpoena would require production of numerous categories of documents that include what is being sought by Arrowood in its investigation of the Underlying Actions.

215.     As stated above, since 2017, the Diocese has begun resolving sexual abuse claims through its IRCP Program, and has stated that it has settled approximately 500 claims through the IRCP. *See* **Exhibit C**.

216.     As acknowledged by Bishop DiMarzio himself, the Diocese established the IRCP as a means of gathering information. **Id.**

217.     The Diocese has stated publicly that as part of its efforts to create a list of "Diocesan Clergy for whom the Diocese Received Allegations of Sexual Misconduct", an investigation was undertaken into each and every allegation of abuse made against each respective priest to determine the veracity of the allegations.

218.     Furthermore, the Diocese has claimed cooperation with the Attorney General's subpoena, and notwithstanding the information gathering undertaken in the IRCP process, the Diocese has continued to withhold the vast universe of documents in its possession from its insurer, Arrowood.

219.     Upon information and belief, the Diocese and/or the Affiliated Entities have substantial information in their possession and control responsive to Arrowood's RFIs based on an extensive history of claims of abuse.

220.     However, the Diocese and the Affiliated Entities have failed to respond to the vast majority of the RFIs sent by Arrowood.

221.     The Diocese and the Affiliated Entities have engaged in an unreasonable and willful pattern of refusing to provide Arrowood with information and documents related to the Underlying Actions.

222.     The Diocese and the Affiliated Entities have materially breached their duty to cooperate with Arrowood's investigation of the Underlying Actions.

223. Arrowood accordingly requests that this Court declare that Arrowood has no obligation to defend and/or indemnify the Diocese and/or the Affiliated Entities in the Underlying Actions in which it has agreed to participate, due to the Diocese's and the Affiliated Entities' deliberate and material failure to cooperate with Arrowood's investigation of the Underlying Actions.

## FOURTH CAUSE OF ACTION

**(Declaratory Judgment – Arrowood Has No Duty to Defend and/or Indemnify Affiliated Entities Who Are Not Insureds Under the Arrowood Primary Policies and Arrowood Excess Policies)**

224. Arrowood repeats and incorporates by reference the allegations in paragraphs 1 through 223 of the Complaint as though fully set forth again herein.

225. Arrowood has no obligation to defend and/or indemnify the Affiliated Entities in the Underlying Actions who are not insureds under the Arrowood Primary Policies and Arrowood Excess Policies.

226. The Arrowood Primary Policies and the Arrowood Excess Policies were issued to the Diocese and certain other entities, as referenced in the various Policy Declaration Pages, Certificates and Endorsements.

227. Several of the Underlying Actions name Affiliated Entities who are not otherwise insureds pursuant to the various Policy Declaration Pages, Certificates and Endorsements under the Arrowood Policies during the relevant years of abuse alleged in the respective Underlying Action.

228. Arrowood has declined to defend or indemnify any Affiliated Entity who are not otherwise insureds pursuant to the various Policy Declaration Pages, Certificates and

Endorsements under the Arrowood Policies during the relevant abuse period alleged in the respective Underlying Action.

229.     The Diocese has failed to provide Arrowood with any certificates, endorsements, or any other documentation, that name these Affiliated Entities as insureds under the Arrowood Policies during the relevant abuse periods for the respective Underlying Actions.

230.     The Diocese and the Affiliated Entities have the burden to establish the issuance and terms of the Arrowood Policies, including the existence of certificates and/or endorsements, or any other documentation that name the defendant Affiliated Entities as insureds under these policies.

231.     The Diocese and the Affiliated Entities have failed to meet their burden of establishing that those Affiliated Entities for whom Arrowood has declined to defend or indemnify, qualify as insureds under the Arrowood Policies, in effect during the relevant abuse periods.

232.     The Arrowood Policies do not provide defense or indemnity coverage for the Affiliated Entities who are not insureds under the Arrowood Policies.

233.     Arrowood accordingly requests that this Court declare that Arrowood has no duty to defend and/or indemnify certain Affiliated Entities who are not insureds under the Arrowood Policies, during the relevant abuse period alleged in the Underlying Actions.

## FIFTH CAUSE OF ACTION

**(Reimbursement by the Diocese to the Extent Arrowood has incurred any Defense Costs on behalf of the Diocese and/or the Affiliated Entities in The Underlying Actions)**

234.     Arrowood repeats and incorporates by reference the allegations in paragraphs 1 through 233 of the Complaint as though fully set forth again herein.

235. As Arrowood has no duty to defend the Diocese and/or the Affiliated Entities in the Underlying Actions as set forth in the above Causes of Action, the Diocese is obligated to reimburse Arrowood to the extent any costs have thus far been paid by Arrowood for the defense of the Underlying Actions.

236. Accordingly, Arrowood requests that this Court declare that the Diocese is obligated to reimburse Arrowood to the extent that any defense costs have thus far been paid by Arrowood for the defense of the Diocese and Affiliated Entities in the Underlying Actions.


## SIXTH CAUSE OF ACTION

**(Declaratory Judgment – Arrowood Has No Duty to Defend and/or Indemnify the Diocese and Affiliated Entities Under the Arrowood Policies for Certain Underlying Actions, to the Extent The Diocese and/or Affiliated Entities Did Not Provide Arrowood With Timely Notice As Required Under The Arrowood Policies.**

237. Arrowood repeats and incorporates by reference the allegations in paragraphs 1 through 236 of the Complaint as though fully set forth again herein.

238. The Arrowood Primary Policies and the Arrowood Excess Policies obligate the Diocese and/or Affiliated Entities to provide timely notice of occurrences, claims and/or suits.

239. Upon information and belief, despite previously receiving credible allegations of sexual abuse of children by clergy, the Diocese and/or the Affiliated entities failed to provide the required timely notice to Arrowood.

240. Upon information and belief, the Diocese and/or the Affiliated entities knew of information and prior complaints of sexual abuse of minors by clergy and Diocese employees, and failed to provide timely notice to Arrowood.

241.    Arrowood has no obligation to defend and/or indemnify the Diocese and/or Affiliated Entities under the Arrowood Policies for certain Underlying Actions, to the extent the Diocese and/or Affiliated Entities did not provide Arrowood with timely notice as required under the Arrowood Policies. Accordingly, Arrowood requests that this Court declare that Arrowood has no obligation to defend and/or indemnify the Diocese and/or Affiliated Entities under the Arrowood Policies for certain Underlying Actions, to the extent the Diocese and/or Affiliated Entities did not provide Arrowood with timely notice as required under the Arrowood Policies.

## SEVENTH CAUSE OF ACTION

**(Allocation of defense costs and/or indemnity in certain Underlying Lawsuits)**

242.    Arrowood repeats and incorporates by reference the allegations in paragraphs 1 through 241 of the Complaint as though fully set forth again herein.

243.    In certain of the Underlying Lawsuits in which Arrowood is defending the Diocese and/or certain Affiliated Entities, the sexual abuse is alleged to have occurred over a course of time, beginning within an Arrowood Policy period and continuing thereafter, or beginning prior to an Arrowood Policy period and continuing into an Arrowood Policy period.

244.    Accordingly, Arrowood requests that this Court declare that, to the extent it is determined that Arrowood is obligated to defend and/or indemnify the Diocese and/or certain Affiliated Entities in connection with any of the Underlying Actions, Arrowood is obligated only to pay its share of defense costs and/or indemnity, consistent with applicable law and applicable policy language.

**WHEREFORE**, plaintiff Arrowood requests that this Court enter judgment:

A.    Declaring that Arrowood has no obligation to defend and/or indemnify the Diocese and/or the Affiliated Entities under the Arrowood Policies for Underlying Actions alleging abuse by Father Romano Ferraro;

B.    Declaring that Arrowood has no obligation to defend and/or indemnify the Diocese and/or the Affiliated Entities under the Arrowood Policies for Underlying Actions alleging abuse by Father Thomas O'Rourke, Father Vincent Sforza, and Father James Sickler;

C.    Declaring that Arrowood has no obligation to defend and/or indemnify the Diocese and/or the Affiliated Entities under the Arrowood Policies for Underlying Actions alleging abuse by previously known abusive priests;

D.    Declaring that Arrowood has no duty to defend and/or indemnify the Diocese and/or the Affiliated Entities in the Underlying Actions due to the Diocese's and/or the Affiliated Entities deliberate and material failure to cooperate with Arrowood's investigation of the Underlying Actions;

E.    Declaring that Arrowood has no duty to defend and/or indemnify certain Affiliated Entities that are not insureds under the applicable Arrowood Policies, for the claims and/or abuse alleged in the Underlying Action;

F.    Declaring that Arrowood is entitled to reimbursement from the Diocese and/or the Affiliated Entities to the extent that any costs have been paid by Arrowood for the defense of the Diocese and/or Affiliated Entities in the Underlying Lawsuits, in an amount to be determined by the Court;

G.    Declaring that Arrowood has no obligation to defend and/or indemnify the Diocese and/or Affiliated Entities for certain Underlying Actions, to the extent the Diocese

and/or Affiliated Entities did not provide Arrowood with timely notice as required under the Arrowood Policies;

H.     Declaring that to the extent it is determined that Arrowood has any obligation to defend and/or indemnify the Diocese, Arrowood is obligated only to pay its share of defense costs and/or indemnity, consistent with applicable law and applicable policy language;

I.     Making such further declarations as may be required to fully determine Arrowood's rights with respect to the Arrowood Policies as it relates to the Underlying Actions, and resolving all disagreements between Arrowood, the Diocese and the Affiliated Entities with respect to the coverage provided for the Underlying Actions; and

J.     For other and further relief as the court deems just, proper and equitable.

Dated: New York, New York
       December 28, 2020

**COUGHLIN DUFFY LLP**

By: *Lorraine M. Armenti*
       Kevin T. Coughlin, Esq.
       Lorraine M. Armenti, Esq.
       Wall Street Plaza
       88 Pine Street, 28th Floor
       New York, New York 10005
       (212) 483-0105
       *Attorneys for Plaintiff,*
       *Arrowood Indemnity Company*